Coos,
Mar. 6, 1945. } No. 3506.

FRANK L. BLAKE *v.* CLYDE HICKEY & a.

*Bernard Jacobs* and *Murchie & Murchie* (*Mr. Alexander Murchie* orally), for the plaintiff.

*Frank P. Blais* and *Arthur J. Bergeron* for the defendants, furnished no brief.

BRANCH, J.   The plaintiff alleges in his bill that the defendants "on various days and times from on, to wit, the first day of July, 1941, up to the date hereof have continually trespassed on the petitioner's lands on foot and with their automobiles."   In their answer, the defendants say: "That a highway has been established over said road by prescription and user, and that said road has been used by the public" since the year 1894.   No request for findings of fact having been made by the parties, it must be assumed that the order of the Court is based upon an implied finding that the existence of a highway was established by the defendants.   The question is, therefore, presented, whether there is any evidence that the road in question was a highway prior to July, 1941.

"To establish a highway by prescription it must appear that the way was used by the general public continuously without interruption for a period of twenty years (P. L., *c.* 74, *s.* 1), under a claim of right without the permission of the owners."   *Wason* v. *Nashua*, 85 N. H. 192, 198.   Under the law thus stated, the evidence presented three questions of fact for the determination of the trial Justice: 1, Did the use of the road by the public cover a period of twenty years prior to July 1, 1941; 2, Was the alleged use continued without interruption by any assertion of paramount right; and 3, Was the use of such a character as to sustain the finding of the trial Court that the road in question had become a highway?   We have given consideration to the evidence upon each of these questions.

1. With reference to the time element, it would ordinarily be sufficient to refer to the following admission of the plaintiff: "Q. But the road that was there before you built was good enough for

campers and hunters and anyone else, wasn't it? A. Yes. Q. It answered their pupose all right? A. It answered their purpose all right. Q. And they had had it for forty years? A. Yes," and to the testimony of his witness, Alfred Smith, who testified as follows: "*The Court:* How long have you been acquainted with that property? *The Witness:* Fifty years, as long as I can remember. Q. [By *Mr. Blais*] As long as you can remember people who have had occasion to go up there have gone up there? A. Yes. Q. A man who wanted to go up there fishing went up there fishing? A. He certainly did. Q. And if he had a camp he went up camping? A. Certainly. Q. They didn't use it as a pleasure, but a man who wanted to went up there. . . ? A. Certainly." However, inasmuch as these witnesses gave some contradictory testimony, it may be well to point out the following additional and unequivocal evidence.

The road in question was described by the trial Court in his order as follows: "the new road so-called, being the road which runs southerly from the main road between Groveton and Berlin on the westerly side of Mill Brook so-called, up to the dugway road and thence to the camps owned by certain of the defendants." There was evidence of considerable travel up and down Mill Brook dating from about 1894, but the evidence also tended to prove that this travel in the early years was entirely on the east side of the brook over what was called "the old road." There was testimony, however, that as early as 1916, there was a well defined road on the west side of the brook which was passable by horse-drawn vehicles. The witness stated that, in that year, he went over the road once with a buckboard and a pair of horses to haul out a deer which he had shot, and again with a small wagon and a horse to haul in some furniture to a camp which he had built "up there." There was a large amount of evidence to the effect that in 1917 one Matt Smith "fixed up" the road on the west side of the brook and from that time on "if a man had occasion to go up there he went and everybody knew it." The plaintiff became the owner of the lands adjoining this road in 1934 and at once proceeded to improve it further to facilitate his logging operations and "for the other fellows logging up there." The public use of the road continued. "They have used it for any purpose; anyone who had to go up there used it." It thus appears that there was ample evidence to support the implied finding of the trial Court that the new road had been in existence upon July 1, 1941, for more than twenty years.

2. There was much conflicting testimony as to gates, bars and

fences across the road installed by various parties. This testimony
merely presented an issue for the trial Court to pass upon as to
whether the use of the road had been interrupted by the owners of
the adjoining lands. The most definite evidence of this kind was
that of the plaintiff who claimed that, in 1937, he erected a gate with
a lock across the road in order to prevent people from stealing some
wood which he had piled in an adjoining field. This testimony was
contradicted by several witnesses who were familiar with the road
for many years and who testified that they never knew of any ob-
struction anywhere on the highway. But the complete answer to
this testimony lies in the fact that the period of prescription might be
found to have expired in 1936, and any attempts to interrupt the
use of the road thereafter, were necessarily unavailing.

3. It clearly appeared from the evidence that the real basis for the
plaintiff's determination to close the road to public travel lay in the
fact that the use of automobiles upon it in wet weather damaged
the roadway, and a considerable portion of the evidence had to do
with the question of how long it had been used by automobiles.
This question does not appear to be decisive of any issue now before
us for consideration. We do not subscribe to the view that the right
acquired by user is no broader than the use. We think rather that
where the right is founded upon travel in the modes formerly in use
in the locality, it will expand with the natural development of means
of transportation. Such was the holding in *Hamp* v. *Pend Oreille
County*, 102 Wash. 184, L. R. A. 1918E, 400. As indicated in the
note to that case (*p.* 402), authority upon this precise point is meagre
but such cases as have been found support that decision. See
*State* v. *Scott*, 82 N. H. 278, 279; *Richmond* v. *Bethlehem*, 79 N. H.
78, 81. This result is a corollary of the rule, well settled in this
jurisdiction, that when a road is established by use alone, it is not
necessarily limited to the traveled track and the ditches on each side.
*Willey* v. *Portsmouth*, 35 N. H. 303, 312; *Coffin* v. *Plymouth*, 49 N. H.
173, 175; *State* v. *Morse*, 50 N. H. 9, 20. As above stated, there was
evidence that the road had been used for vehicular travel as early
as 1916, and the natural transition from horsedrawn to self-propelled
vehicles did not affect the running of the period of prescription or
the rights thereby obtained. It appeared that the principal use of
the road was by lumbermen, wood cutters, farmers, hunters, fisher-
men and the owners of camps located in the neighborhood of Mill
Brook. This use, while intermittent and of slight volume, was
characteristic of the kind of road claimed (*Salminen* v. *Jacobson*, 83

N. H. 219), and was sufficient to sustain a finding by the Court that a highway had been established by prescription.

*Exceptions overruled.*

BURQUE, J., dissented: the other concurred.

PAGE, J., *concurring:* There was no expressed finding as to the nature of the defendants' rights in the way. The order may be sustained by an implied finding either that the way is a public highway or that it is a private right of way appurtenant to land in which the defendants have an interest. The plaintiff recognized this when excepting to the order on the ground that there was no evidence upon which it could be found that the defendants obtained a right by dedication or otherwise. If this way could not be found to be a public highway, as to which doubt has been expressed, there is ample evidence that the defendants are lessees of the owner of land appurtenant to which this way has been used for much more than the prescriptive period.

BURQUE, J., *dissenting:* In the absence of findings upon which the decree is based, I am of opinion that we must assume an implied finding to the effect that the road in question has been deemed to be a public highway.

It seems to me that the facts most favorable to the defendants to establish such a proposition can be summarized as follows: Previous to 1917 access from the dugway to the main highway was had over land east of what is known as Mill Brook. In that year the road, known as a tote and go-back road used mainly for logging purposes, was improved some by one Smith, but wires or barways were, for different purposes, maintained across the south entrance to the road from then on to 1937. But one automobile was known to have used that road, and then but once, in 1923, by a civil engineer. The only others known to have used the road during those years were hunters and fishermen, during the hunting and fishing seasons, and by them on foot. One of the defendants, Pike, built a camp in 1938 on leased land, and traveled to and fro over the road in question, from then on, though he says he had been going in there since 1929, probably half a dozen times a year. From 1924 or 1925 on, old, high slung cars such as Model T Fords could be and were used to a limited extent. One witness testified that he had been in there once with a Ford, probably as early as 1916. There is some very general testi-

mony to the effect that people have been seen using the road, but invariably it is limited to sportsmen, mostly on foot, and on few occasions with teams over part of the road to haul out deer. The one witness who seems to have used the road the most fixes the maximum trips made by him in one year to sixteen.

In 1934 plaintiff purchased an extensive tract of land in the area covered partly by this old road. In order to facilitate his logging operations he built a new road, on the west side of the Mill Brook, from the main highway for a considerable distance partly over land of two other owners, with one of which at least he had a mutual agreement for the use of one another's land, which road joined the old road at or near the High Bridge or dugway. He had trouble with people stealing some of his wood, so he erected fences, wires and barways, and kept some of them under lock and key. He also, after a while, put up a sign "Private Road" at the entrance of the road. The improvements to the road were made at his own expense. There was also evidence that other owners, at least probably two, had also made some improvements to some parts of the old road in order to enable them to conduct their lumbering operations, but no other but the plaintiff made any improvements on the new road, at least from the main highway to the point of juncture with the old road. There was no evidence whatever that the town of Stark, in which these lands were located, ever expended any money whatsoever for the building, upkeep, repair or maintenance of either one of the two roads, nor had ever exercised any control or supervision over them. The roads were never laid out as required by law. R. L., c. 90, s. 2.

Two of the defendants acquired leases over some lots of land for camping purposes; the first November 1, 1938, and the second November 1, 1940. From then on they undertook to travel over the new road to have access to their camps. Plaintiff did not object as long as they traveled on foot, or as far as they could go with their cars, provided they limited themselves to the use of the road when it was dry. When wet, in rainy seasons, the use of automobiles damaged the road, so plaintiff objected, but to no avail, hence the petition for an injunction.

Photographic exhibits in the case show the road to be a one-lane road, over rough terrain, with bars across it, and with the floor of the bridge known as High Bridge anything but in good condition, all of which tend to negative and disclaim a substantial use of the way by the public.

On such a state of proof it is difficult to see how anyone can seriously contend the road in question to be a public highway. "A highway may be proved by long usage. But a way to become public must be used in such a manner as to show that the public accommodation requires it to be a highway, and that it is the intention of the owner of the land to dedicate the way to the public." *Barker* v. *Clark*, 4 N. H. 380, 383; *State* v. *Nudd*, 23 N. H. 327, 337. Evidence to the effect that some people may have long been accustomed at certain times of the year and for certain limited purposes to pass over some portion of the road on plaintiff's property, on foot and with teams, or motor vehicles, is not sufficient to establish it as a public highway, unless such evidence goes far enough to prove that the way had been opened, or made, or repaired as a highway (*Barker* v. *Clark, supra*, 383), which latter evidence is lacking utterly in this case. It may well be said here, as it was said in *State* v. *Nudd, supra*, 338, 339, that "The use made of the way was private in its character, and not general; was trifling in amount, and at most, only occasional, at particular seasons of the year. . . . Such a use would certainly furnish no evidence of a public necessity for a road, and consequently, none of a dedication to such use is to be inferred from public use and necessity. . . . It is well settled that even an uninterrupted and constant use of a way for twenty years, is not conclusive evidence of a right." See also *Wason* v. *Nashua*, 85 N. H. 192, 198 and cases cited.